Service and Sally Jewell in her official capacity as Secretary, United States Department of the Interior. Mr. Peterson for the appellants, Mr. DiMascio for the appellees. I'd like to reserve two minutes for rebuttal, please. May it please the Court, my name is Ray Peterson. I'm here on behalf of the United States Fish & Wildlife Service. I'm here on behalf of the appellants. It may seem expedient to hold that this case is simply a repeat of the attempted intervention of the Safari Club. But such a finding would ignore the substantial differences between the parties and the nature of the action brought by appellants. The Service would have the Court ignore the totality of the Endangered Species Act licensing process, a process that involves much more than simple allocation of agency budget. Appellants are property owners that both develop land and engage in species protection. They're at the center of the Endangered Species Act. The presence of candidate species and habitat on their land affects several concrete interests that confer them standing. The Service would have the Court ignore the fact that it has well-developed policies and practices to ensure protection of candidate species and to annually gauge the status of all the species petitioned before it. The record before the Court is replete with examples of how the Service interacts with landowners and local governments. The Service both solicits and at times coerces landowners to engage in activities to protect candidate species. These activities benefit the species, the Service, and landowners alike. Such property and conservation interests have been recognized by the Court countless times in other contexts. Finally, the Service would have this Court ignore the fact that the settlement agreements fundamentally change the Service's policies and practices and have a negative impact on appellants' concrete interests and effectively amend the Act. This has been properly pled and backed up with specificity. So, as you know, we had a decision in the Section 4 deadline litigation, the Safari Club case. Can you give us your argument as to how the argument that you're making is distinct from the one that was rejected there? Sure, Your Honor. Well, fundamentally, we are property owners that both engage in conservation activities and that own land that is affected by the presence of habitat and candidate species. Safari Club came there. They asserted interest in delay in order to hunt species. We believe that our interests are fundamentally recognized under the Endangered Species Act. And really, landowners who engage in these activities are at the center of the Act. And the Service itself has said in every context but before this Court the benefits of such activities. It benefits the species by getting ahead of species conservation. It benefits the landowners by allowing them to deal with Endangered Species Act effects up front. And it benefits the Service itself because the Service is allowed to save on agency budget and then otherwise doesn't have to affect those species. And I would also add that all they ever got to was denial of standing during intervention for the Safari Club. We filed a lawsuit that has four counts, both Administrative Procedure Act and the Endangered Species Act. And we make many different arguments that were not raised below. What specific procedural violation are you alleging here? Okay, well, we have four different counts. Overall, it's the failure to follow the procedures for considering species status, which has many aspects to it. One, it's the failure to use best available science in rendering those decisions. We believe the settlement agreements essentially made a static decision on species status that is inconsistent with the Act. Well, your challenge is to the agreement, correct? In other words, to them entering into the agreement. And the agreement itself simply sets Greece to do something within a particular time but doesn't affect their discretion. Your Honor, the agreements aren't merely a deadline. They change the status of species, and the change causes various parties to act immediately, including the Service. And we've both pledged this and we've shown this in our declarations. It fundamentally amends the Act. It's evidenced by the Service's own interaction. The Kauffman Declaration shows what happens when the Service switches from cooperation on candidate species to coercion. We're about to list the species. And we believe that this was done without notice and comment under the Administrative Procedure Act. It's effectively a rule. We believe they've amended the guidelines, the LPN guidelines, and the statute makes clear that any amendment to the guidelines is supposed to have notice and comment. But some of the species weren't listed, right? Some of the species were not listed. That's correct. So doesn't that tend to confirm that we don't know what's going to happen as a consequence of the accord? We have to wait to see. Well, many more were, and I believe that, you know, with the under the law, we don't necessarily have, in order to do, we're only attempting to gain standing. We're looking at the broader picture, not species by species. Under the law, we don't have to demonstrate that the actual consequences had the agency not acted. We just have to show a reasonable probability. And for some of the species, they were listed, and I think that in itself speaks to the reasonable probability. Mr. Peterson, you said you had four different angles on the procedural violations, and your first one was a failure to use best available science, and you had some colloquy with Judge Brown about that. Did you have others that you wanted to spell out? Well, it's denying our members the opportunity to continue to be part of the Endangered Species Act process. By predetermining the listing priorities for the 251 candidate species, they're basically ignoring the process which was the CNOR process. They make that essentially a meeting process, and this is something that we have participated in since 1975. I understand your brief and you standing here make an attractive policy argument that you could have a statute that has an affirmative, puts in sort of an affirmative wait period in place so that landowners and others could try to mitigate and avoid a listing. But I actually read this statute a little bit differently, that this warranted but precluded really is just, hey, if we could get to everything right away, we would, but we can't, and so we're just stacking this up and putting it in line to be considered for a listing. So it just seems like you're speaking as if the statute is written with a different set of objectives in mind. Well, I believe our objectives are completely consistent with the Act. I think the Court needs to look at the Act in a more broader context. What the service says when it has all these species out there are first, come to us, give us information. They're soliciting information. They're actively asking our clients to set aside land. They're asking us to fund studies. And then on the day that they end, and that's part of the process, and it's completely consistent with the Act. This is not done simply for the sake of delay. We're not the safari club. We're not out there hunting. And I believe it's completely consistent with the Act to play a role to have landowners and groups that are conserving land. I'm not saying it's inconsistent, but let me just try to sharpen this a little bit. If one of the results of the settlement, the years under fulfilling the terms of the settlement, made the service more efficient in processing proposals to list species, and instead of taking 10 years to list species, they're now able to do it within six months. They make a no or yes decision going forward. Would that way of operating under the Act, in your view, be in derogation of your clients' rights or in some way fail to fulfill the purposes of the Act? I suppose, Your Honor, it would depend on how it's done. I mean, our real point is that the decision-making process used to be based on sound science and all the other aspects of the Endangered Species Act. With the agreements, this decision-making process went from one that was public to which we participated. Either we were asked to participate, which is sufficient under the case law. It's enough to have an agency where we're both compelled and asked to participate. But still public in the sense that they have to do a rulemaking on the final listing, no? Yes, they do, but at that point, the harm has already happened. And they also have to do a rulemaking if they're going to amend the LPN rule. So the process for prioritizing species, for example, has always been a public one based on priority, and a lot of that has to do with the actions of our clients in preserving species, providing information. When the service went into a dark room and met with environmental groups and decided what the priority was, they reshuffled the deck, and we believe that's arbitrary and capricious. We believe that, especially for purposes of standing, our role as both requested by the service and we believe we have a right under law as well. Well, you said they went into a dark room, and they went into a federal court, which is an open public forum, and they had evidence. Did you seek to intervene in that litigation? We did not. Safari Club did, and they were thrown out. And if we don't have a right to be a part of that process, I honestly don't know who does. Because the Endangered Species Act is ultimately all about land preservation and protection. Our clients are the ones that have the land. We're the ones that are ultimately regulated from the very beginning. And I want to make it clear that the effects of the act do not crystallize upon listing. The effects of the act are felt at the candidate's species status, and they were felt immediately, and we have declarations backing this up, that the service itself, when it switches, when the deadline comes up, artificial deadline based on agreement, it immediately switched from, would you please work with us to you shall comply and you shall change your land because listing is inevitable. And we believe we've demonstrated that in our declarations, and at this point in the proceeding, that's all we have to do. Again, we're just talking about standing here, and we just urge the court to be careful not to decide questions on the merits against us when we're only here at a point of declarations on standing. Thank you. While I'm here for further questions, I notice my time is up. Thank you, counsel. Thank you. Good morning, Your Honors. Nicholas Demasio on behalf of the U.S. Fish and Wildlife Service, and may it please the court. The U.S. Fish and Wildlife Service here decided to exercise its discretion under the Endangered Species Act to clear out a backlog of 251 candidate species that had been developing for over a decade. The backlog developed primarily due to constraints on the agency's congressionally appropriated listing budget and a steady stream of new listing petitions. Now, to clear out that backlog, the service entered into the settlement agreements at issue here, which preserve the agency resources necessary to decide whether or not to list the candidate species as threatened or endangered. Homebuilders would like this court to overturn those settlement agreements because they do not want the service to clear out the backlog. They would prefer that the service never decide the species status. The district court's judgment that homebuilders lack standing to challenge the settlement agreements should be affirmed for two reasons. First, homebuilders are trying to relitigate this court's previous decision that the ESA's warranted but precluded provision is, and I'm quoting here, a relief valve for the benefit of the service given its limited resources. Under that holding, homebuilders have no procedural right to force the service to consider making a warranted but precluded finding for the candidate species at issue. Second, under this court's holding in Perseus Zepi, the agreements do not cause any actual or imminent injury to homebuilders. The agreements merely set deadlines for the service to decide whether or not to propose a listing rule, and they preserve the agency's discretion not to propose a listing rule. Now, with respect to procedural injury, this court has already decided, in Safari Club's previous challenge to these self-same agreements, that they do not cause the alleged procedural injuries here. Homebuilders offered nothing to distinguish the procedural injury analysis in this court's previous decision. Can I ask you a question? So your opposing counsel says that if they don't have standing to raise a procedural injury claim, that nobody would, and I'm not sure that that necessarily suggests a conclusion one way or the other, but is that premise right? Well, with respect to procedural injury, Your Honor, as this court previously held, that the warranted but precluded provision that they're focusing on is designed as a relief valve for the benefit of the service to protect its interests because of its limited resources. And so you're absolutely correct that if your focus, the focus of the procedural injury argument is on the warranted but precluded provision, no private individual would have standing to seek redress based on that procedural injury. And that's specifically because the procedures in Section 4 are actually designed to expedite the service's decisions based on listing petitions consistent with its resources. And so no private parties have any procedural right under the warranted but precluded provision because they're simply not designed to protect their interests. Furthermore, with respect to injury in fact, this Court has already decided that this type of settlement doesn't cause any actual or imminent injury. In Per se sepi, this Court confronted a settlement agreement that included a timetable to decide whether or not to issue a rule and specifically reserved the agency's discretion not to issue a rule. In that case, this Court held that the plaintiffs lacked standing because they only faced a possibility of adverse regulation and the same analysis applies here. The agreements do not regulate homebuilders' property, nor do they render any voluntary conservation efforts worthless, as they contend, because they merely set a time to decide whether or not to propose a rule and they reserved the agency's discretion not to propose a rule. And that's borne out by the facts here because if you actually look at the decisions that the service rendered, the decision decided that listing was not warranted for five out of the nine pocket gopher species that they complain about in their complaint. Mr. Damasio, let's assume that the service is clipping along and keeping up with the listings and landowners in the position of homebuilders' members want to basically be heard on their efforts to preserve habitat and to preserve species and indeed may want to delay a determination one way or the other whether a species needs to be listed. Is there any procedure for that? There's no procedure to delay a decision on a proposed listing rule. And that's specifically because the Endangered Species Act forecloses judicial review in the circumstance where the service makes a warranted finding and proposes a listing. I'm not talking about judicial review. I'm talking about administratively within the service's own process. If a party wanted to say, hey, look, let's not list. Let's do X, Y, and Z, and that'll really, this species will bounce back and it really won't need to be listed. And, you know, is there a process for that under the statute? I don't, I'm not aware of one, but I was asking you whether administratively or statutorily there's some kind of process for that. The statute does not set up any right to participate at that level of the service's decision making. What it states is that within 12 months of receiving a listing petition that the service believes may present substantial evidence that listing the species is warranted, it needs to make one of three decisions. That is, either it's not warranted, it's warranted, or it's warranted but precluded. And the statute simply does not provide any opportunity, any right to provide comment at that stage of proceedings. That's what this Court specifically held in its previous decision in the Safari Club challenge. Now that's not to say that the service doesn't open up the doors to members of the public who have an interest and to the extent that it can consider, you know, their opinions on where the species stand while the species is precluded. It certainly does provide opportunities in a voluntary sense to come forward with that information. There's no procedural right to provide that information. There is a right upon listing, notice and comment. There's a right upon the proposal of a listing rule. Right. And that's found in Section 1533b-5. You can see the procedures there are specifically set up to provide members of the public with an opportunity to comment upon a proposed listing rule. And to the extent that what home builders are arguing here is that they've been shut out of the process, that's simply not true. Because upon proposal of a listing rule, all they need to do is participate in the notice and comment process. And if ultimately a rule is issued that they think is adverse to their interests, they can attempt to bring suit to challenge that rule. Mr. Peterson seems to be arguing that the effect of the agreements was to shut people out of the process who had been able to participate earlier. And you did say that even pre-listing there's some opportunity for the public to participate. Or did I misunderstand you? When the service makes an affirmative warranted but precluded finding, finds a species to be precluded, then subsequently there are opportunities for members of the public to provide the service with further information about the species to inform its decision making. But there's no procedural right at that stage to block a proposed listing rule because you think that the service should allocate its resources differently. And the way that you know that is looking at the judicial review provision of the Endangered Species Act. There's no judicial review provided when the service makes a warranted finding and proposes a listing rule. At that stage, what happens is the service provides an opportunity for notice and comment. Members of the public can come forward to explain why they think that voluntary conservation efforts or other efforts to protect the species are sufficiently protective. And then, you know, the service comes out with its final decision. And if it's adverse to your interests, you can seek to challenge that final decision. And you can see that borne out again by the facts here because if you look at the Federal Register notice for the final decisions, the service's decision about the Shelton pocket gober, for example, the service specifically, one of the reasons why it decided that listing was not warranted for that particular species specifically was because it found that existing habitat protection efforts were sufficiently protective of that species. And so, again, you can see the process playing out. These agreements specifically reserve the agency's discretion as to its substantive decisions. There's no procedural right at that stage of the proceedings to have any opportunity for comment. And so, at the end of the day, home builders here have not alleged any procedural injury or any ultimate injury, in fact, from these agreements, and they therefore would lack standing to challenge them. And your response to their contention that the settlements effectively, in a non-public manner, forfeit from them the benefits of their conservation efforts is what? Well, again, Your Honor, because the agreements specifically preserve the agency's discretion to decide whether or not those conservation efforts render listing unwarranted, they haven't forfeited the benefits of those efforts. The service can still take them into account when it's making its decision about whether or not to list the species. And, again, the Shelton Pocket Gopher is a perfect example of where those types of efforts were taken into consideration and ultimately, in part, led to a decision that listing was not warranted. Your Honors, I'd just like to close with the fact that these species at issue here were candidates for listing for over a decade. In the final analysis, home builders do not have standing to challenge the service's discretionary decision to allocate its resources to deciding those species' status and, more generally, to clearing out the backlog of other candidate species. The district court's judgment here should be affirmed. All right. Thank you, Mr. Damasio. I know Mr. Peterson did not have any time left. We'll give you one minute. Participation in a completely different process is insufficient to make us whole. Our standing is based on the injury to conservation and other activities that are taken in the process that the service itself solicits. I don't think there's any question that ---- Can I ask you how is it a different process? I mean, it sounds like you're just at a later place in the process, but it's still the listing process. Right. But as the Kauffman Declaration has shown, and if we had discovery in the cases we were shown, when the service switches from candidate status to you're about to be listed, it throws in a whole bunch of different requirements, and the requirements upon listing hurt us a lot more. And I'll say this. We lose our property rights on the day that the agreements were signed because the service, and it's sufficient to the service solicits this information, the service asks for it, and we have a right to have that information considered at that time. It's not enough to say, you know what, we will let you get another shot at this down the line. If they solicit information during the candidate review process, they have us spend all this money, set aside all this land, and then say, you know what, we've reached a different decision. We're changing the priority of the species. That harms us, and that's exactly what happened here. And it's not enough to have us give a shot. And they also don't have unlimited discretion. And that's what immersed this question that we want to get to, whether or not they have unlimited discretion to amend listing priority guidelines. I mean, the law says they do not. Whether or not the settlement agreements are actually an amendment of the Endangered Species Act under the APA where we have a notice, a right to notice and comment. And voluntary efforts are concrete interests when made in reliance on government representations, and that's exactly what happened here. Our guys did not decide to set aside thousands of acres of land without reaching an agreement with the service on what the planning process would be. And it's a good thing to have species get off the list. The 10-year delay, because they prioritized, no species went extinct during this time. It's a good thing, and the service itself has said it benefits everyone, the species, us, and them. But, Mr. Peterson, you talked about the limitation on their discretion to move things around on the list. If there were a new director of the service, came in, you know, no settlement agreements at all, and just like, we're going to, you know, get this thing rolling, go ship shape, and decided to process everything much faster, are you saying that would be arbitrary and capricious or subject to challenge, or if this was something that, and I realize this is a hypothetical, but if this is something that the service had decided as a matter of administering this program and just really wanted to tackle the backlog and move it through, you're saying that that would have been contrary to the statute? No, no, I'm saying that's the way the process should work. It should be a public process whereby they use the information that they solicit, whereby they give the listing priorities so people can do long-term planning, so they can get the, a lot of these species were low on the priority because they didn't have sufficient information about them. Our members provided that information and were, you know, were asked to provide, spend, you know, hundreds of thousands of dollars providing that information. And I get it, one species wasn't listed, but hundreds of other species were quickly listed as a result of this process. It fundamentally changed the speed and the process in which species were listed. And the prior process under the CNOR, it made them show their math. And that's what we're asking is they have to show their math. The Endangered Species Act can't be run and can't be amended through settlement agreements with third parties. And the provision, so under my hypothetical, when the service spontaneously wants to rejigger the list and move everything really quickly, what's the provision that you're saying would require them to, as you put it, show their math? Well, for example, the listing priority guidelines. We believe those have been amended, and that's inconsistent with the law. The law states that the listing priority guidelines cannot be amended without public notice and comment. And they've clearly been amended by the settlement agreements. Okay. Thank you, Mr. Peterson. Thank you. The case will be submitted.
judges: Brown, Srinivasan, Pillard